# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **LARRY K. WALLACE,** | ) | |
| Plaintiff | ) | Civil Action No. 2:22cv00022 |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MARTIN J. O'MALLEY,**[1] | ) | |
| **Commissioner of Social Security,** | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |
| | ) | |

*I. Background and Standard of Review*

Plaintiff, Larry K. Wallace, ("Wallace"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition. Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It

---

[1] Martin J. O'Malley, ("O'Malley"), became the Commissioner of Social Security on December 20, 2023. Pursuant to Federal Rules of Civil Procedure Rule 25(d), O'Malley should, therefore, be substituted for Kilolo Kijakazi as the defendant in this case. Pursuant to the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), no further action is required to continue this suit.

consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Wallace protectively filed his application for DIB on September 27, 2020, alleging disability as of March 20, 2020, based on intellect; expressive language disorder; osteoarthritis; gastroesophageal reflux disease, ("GERD"); and vitamin D deficiency. (Record, ("R."), at 13, 153-54, 178.) The claim was denied initially and upon reconsideration. (R. at 82-92.) Wallace then requested a hearing before an administrative law judge, ("ALJ"). (R. at 95.) The ALJ held a hearing on March 11, 2022, at which Wallace was represented by counsel. (R. at 30-52.)

By decision dated March 21, 2022, the ALJ denied Wallace's claim. (R. at 13-25.) The ALJ found Wallace meets the nondisability insured status requirements of the Act for DIB purposes through December 31, 2025. (R. at 15.) The ALJ found Wallace had not engaged in substantial gainful activity since March 20, 2020,[2] the alleged onset date. (R. at 15.) The ALJ determined that Wallace had severe impairments, namely, lumbar spine narrowing; osteoarthritis; hypertension; an intellectual disorder; and a speech and language disorder, but he found Wallace did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 15-16.)

---

[2] Therefore, Wallace must show he was disabled between March 20, 2020, the alleged onset date, and March 21, 2022, the date of the ALJ's decision, to be eligible for benefits.

The ALJ found that Wallace had the residual functional capacity to perform medium work,[3] except he could perform work involving instructions and tasks limited to those that can be learned in 30 days or less; that required no more than occasional decision making and changes in the work setting; and no more than occasional interaction with the public. (R. at 20.) The ALJ found that Wallace was able to perform his past work as a belt picker. (R. at 23.) In addition, based on Wallace's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found a significant number of jobs existed in the national economy that Wallace could perform, including the jobs of a hand packer, a store laborer and a cleaner, I.[4]  (R. at 24-25, 46-48.) Thus, the ALJ concluded that Wallace was not under a disability as defined by the Act from March 20, 2020, through the date of the decision, and he was not eligible for DIB benefits. (R. at 25.) *See* 20 C.F.R. § 404.1520(f), (g) (2022).

After the ALJ issued his decision, Wallace pursued his administrative appeals, (R. at 148-49), but the Appeals Council denied his request for review. (R. at 1-6.) Wallace then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2022). This case is before this court on Wallace's motion for summary judgment filed April 5, 2023, and the Commissioner's motion for summary judgment filed June 5, 2023.

---

[3]  Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, he also can do sedentary and light work. *See* 20 C.F.R. § 404.1567(c) (2022).

[4] The vocational expert identified the job of cleaner II, rather than cleaner I. (R. at 48.) He stated that the job as cleaner II entailed cleaning interiors and exteriors, such as buses, trains, automobiles, etc. (R. at 48.)

*II. Facts*

Wallace was born in 1962, (R. at 153), which classifies him as a "person of advanced age" under 20 C.F.R. § 404.1563(e). Wallace has a high school education and was enrolled in special education classes. (R. at 35, 179.) He has past work experience as a scoop man, a power shovel operator and a belt picker. (R. at 45.) At his hearing, when asked if he stopped working because the coal company he worked for went out of business, Wallace stated that he was "getting to where [he] couldn't hardly work anymore," because he had problems with his back, feet, hands and arthritis. (R. at 38.) He stated that he received unemployment for up to two years and was looking for work during that time. (R. at 38.) Wallace stated that he used an over-the-counter cream and Tylenol for arthritis in his hands and bilateral knee and shoulder pain. (R. at 39, 41, 43.) He stated that he took Tylenol and used heat for his back pain. (R. at 42.) Wallace reported he did not need reminders to take care of his personal care and grooming or to take his medications; he prepared simple meals; he performed household chores and yard work; he shopped weekly; he was able to drive; he could handle finances; he watched television; he spent time with his children; and he talked to family and friends on the telephone. (R. at 195-98, 388.)

In rendering his decision, the ALJ reviewed records from Dickenson County Public Schools; Eric Oritt, Ph.D., a state agency psychologist; Dr. Bert Spetzler, M.D., a state agency physician; Daniel Walter, Psy.D., a state agency psychologist; Dr. Jack Hutcheson, Jr., M.D., a state agency physician; Vitality Wellness Institute, LLC, ("Vitality Wellness"); Southern Medical Group; Dickenson County Community Hospital; Healing Waters Counseling Center, LLC, ("Healing Waters"); and The Health Wagon.

From March 2018 through September 2020, Wallace was seen at Vitality Wellness for annual wellness examinations, at which, he reported ongoing joint pain and digestive symptoms. (R. at 327.) Wallace denied muscle aches and weakness, arthralgias/joint pain, back pain, swelling in the extremities, neck pain, difficulty walking, depression, sleep disturbance, anxiety, hallucinations, suicidal thoughts, mood swings and memory loss. (R. at 318, 320, 325, 331.) Wallace reported he exercised regularly, and he denied depression and insomnia. (R. at 324, 331.) Wallace had good insight and judgment; his mood and affect were normal; he was fully oriented; his recent and remote memory were intact; he had normal muscle tone and strength; he had no tenderness or bony abnormalities; he had normal movement in all extremities with no edema; he had a normal gait and station; his sensation was intact; his deep tendon reflexes were 2+, bilaterally; his coordination was normal; he had no tremor; and his thoracolumbar spine had normal curvature. (R. at 321, 326, 332.) Wallace was diagnosed with GERD without esophagitis; osteoarthritis; vitamin D deficiency; and dysuria. (R. at 322, 327.) Diclofenac gel and meloxicam were prescribed for Wallace's arthritis, and he was restarted on medication for his GERD symptoms. (R. at 327.)

On March 30, 2021, Wallace saw Sia Sloce, PA-C, a certified physician's assistant with The Health Wagon, for persistent left groin pain and bloody stools. (R. at 402.) Wallace denied anxiety and depression. (R. at 402.) Sloce diagnosed rectal bleeding and inguinal bulge. (R. at 402.) On April 9, 2021, an ultrasound of Wallace's left testicle showed mild varicocele and trace fluid. (R. at 407.) That same day, x-rays of Wallace's left testicle showed a left epididymal cyst; very mild left varicocele; and central calcification in the left testicle. (R. at 406.)

On April 10, 2021, Dr. Jacob A. Nysather, D.O., a physician with Southern Medical Group, saw Wallace at the request of Disability Determination Services. (R.

at 375-80.) Wallace alleged disability due to back pain. (R. at 375.) He stated he had back pain "all my life." (R. at 375.) Wallace reported occasional numbness and tingling down both legs. (R. at 375.) He was independent with his activities of daily living. (R. at 375.) Wallace was in no acute distress; he had decreased range of motion of the lumbar spine with muscle spasm, but no tenderness; he had a normal gait; he was able to rise from a sitting position without assistance, stand on tiptoes, heels and tandem walk without problems; he was able to bend and squat with mild difficulty; his grip strength was 5/5 with adequate fine motor movements, dexterity and ability to grasp objects, bilaterally; he had crepitus of both knees and shoulders upon range of motion; he was fully oriented and cooperative; he did not appear depressed or anxious; he was able to communicate with no deficits; his recent and remote memory were intact; he had fair to good insight and cognitive function; he had good tone and full strength, bilaterally, in all muscle groups; his reflexes were normal; and he had intact sensation. (R. at 376-78.) Dr. Nysather diagnosed lumbago; muscle spasm of the lumbar spine; osteoarthritis of multiple joints, including knees and shoulders, bilaterally; GERD with history of unspecified gastrointestinal ulcer; and systolic murmur, unspecified. (R. at 377.)

Dr. Nysather opined Wallace could sit, walk and/or stand for four to six hours in an eight-hour workday with breaks; he could lift and carry items weighing up to 20 pounds; he should limit activities involving squatting, crawling and stooping; he could respond appropriately to questions; he could carry out and remember instructions; and he had preserved mental status with appropriate orientation, affect, thought content, memory and fund of information. (R. at 377.) He also noted that Wallace "may" have difficulty with complex tasks, critical thinking or understanding complicated ideas, and he "may" have difficulty communicating in large groups, as well as mild speech difficulty due to prior cleft lip surgery. (R. at 377.) Dr. Nysather noted that Wallace's application included "intellectual disability

and expressive language disorder," but upon questioning, Wallace denied any special needs at that time or previously. (R. at 377.) Dr. Nysather based his opinion on his examination findings and a review of the objective evidence. (R. at 377.)

On April 20, 2021, x-rays of Wallace's lumbar spine showed mild anterior wedging of the T12; mild L4-L5 disc space narrowing; and his sacroiliac, ("SI"), joints and sacral foramen were unremarkable. (R. at 382.) That same day, x-rays of Wallace's left knee were normal. (R. at 382.)

On April 26, 2021, Wallace saw Sloce to review his lab results. (R. at 399.) He denied any issues or changes at that time. (R. at 399.) His lab work showed an elevated alkaline phosphatase level and kidney function abnormality, but the record does not contain any follow-up information pertaining to this. (R. at 399.) On May 17, 2021, Wallace saw Paula Hill, FNP-BC, a board-certified family nurse practitioner with The Health Wagon, for a vision exam. (R. at 397.) Wallace denied anxiety, but he scored a four on the Patient Health Questionnaire-2, ("PHQ-2").[5] (R. at 397.)

On May 18, 2021, Wallace saw Bradley T. Kinder, M.S., a licensed professional counselor with Healing Waters, at the request of Disability Determination Services. (R. at 386-90.) Wallace's hygiene and grooming were normal; his speech was delayed; his mood was normal; he was cooperative; he made good eye contact; his sensorium was intact; he functioned in the borderline range of intelligence; he was fully oriented; his thought processes were goal-directed and

---

[5] The PHQ-2 is an instrument used for screening for the frequency of depressed mood and anhedonia over the past two weeks. A PHQ-2 score ranges from zero to six. If the score is three or greater, major depressive disorder is likely. *See* https://www.hiv.uw.edu/page/mental-health-screening/phq-2 (last visited Jan. 12, 2024).

unimpaired; he exhibited no perceptual disturbances; his judgment and insight were fair; he had no difficulty with remote recall, as he was able to remember three of three named objects after a five-minute delay; and he had no problems with immediate recall, as he was able to recall five numbers in sequence. (R. at 387.) Wallace reported he had not received inpatient or outpatient mental health services and that he had not been prescribed psychotropic medication. (R. at 388.) Kinder reported that Wallace presented with no symptoms associated with a major mood, psychotic or personality disorder. (R. at 388.) The Wechsler Adult Intelligence Scale-Fourth Edition, ("WAIS-IV"), was administered, and Wallace obtained a full-scale IQ score of 63, placing him in the extremely low range of intelligence. (R. at 389.) Kinder opined Wallace could not perform complex tasks, but he could perform simple tasks; he could maintain regular attendance in the workplace; and routine stressors encountered in the workplace should not overwhelm him if he had frequent breaks. (R. at 390.) Kinder diagnosed borderline intellectual functioning and speech-sound disorder. (R. at 390.)

On May 27, 2021, Eric Oritt, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), finding Wallace's speech and language impairment and intellectual disorder were severe. (R. at 57-58.) Oritt opined Wallace had no limitations on his ability to adapt or manage himself; mild limitations on his ability to interact with others; and moderate limitations on his ability to understand, remember or apply information and to concentrate, persist or maintain pace. (R. at 58.) He noted that, despite functioning at the lower end of intelligence, Wallace was able to work in a semi-skilled job for the past 14 years. (R. at 58.) He also noted that Wallace was able to drive, to handle finances, to perform personal care, to prepare simple meals, to do household chores and to live alone. (R. at 58.)

That same day, Oritt completed a mental assessment, finding Wallace had moderate[6] limitations in his ability to understand, remember and carry out detailed instructions. (R. at 61-62.) Oritt stated Wallace's work-related mental abilities were, otherwise, not significantly limited. (R. at 61-62.) Oritt noted that Wallace functioned at the lower end of intelligence and would have difficulty completing complex and detailed tasks, but would be able to perform simple, routine tasks. (R. at 61.)

On June 14, 2021, Dr. Bert Spetzler, M.D., a state agency physician, completed a medical assessment, finding Wallace could perform medium work. (R. at 60-61.) He found Wallace could sit, stand and/or walk six hours each in an eight-hour workday; push and pull as much as the lift/carry restrictions; and he could frequently climb, balance, stoop, kneel, crouch and crawl. (R. at 60.) Dr. Spetzler indicated no manipulative, visual, communicative or environmental limitations. (R. at 60.)  Dr. Spetzler noted that the record showed Wallace had reduced range of motion of the lumbar spine; he had crepitus to his knees and shoulder on range of motion; and the findings from his lumbar spine x-rays could lead to pain and reduced range of motion. (R. at 60.) In addition, he noted that Wallace's primary care physician's examinations were normal; imaging of Wallace's lumbar spine and left knee were normal; although he had crepitus in his knees and shoulders, he had no swelling, no reduced range of motion, no atrophy and no deformity; he had a normal gait; he had 5/5 strength throughout; his straight leg raising tests were negative; he had normal reflexes, sensation and coordination; he could rise from a sitting position without assistance; he did not use an assistive device; he could stand on his tiptoes, heels and tandem walk without problems; he could bend and squat with mild

---

[6] The regulations define "moderate limitations" as an individual's ability to function independently, appropriately, effectively and on a sustained basis as fair. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(F)(2)(c) (2022).

difficulty; he had no tenderness or trigger points; he was not obese; and he had slight range of motion in the lumbar spine at 75 degrees. (R. at 60-61.) On September 24, 2021, Dr. Jack Hutcheson, Jr., M.D., a state agency physician, completed a medical assessment, which mirrored that of Dr. Spetzler. (R. at 71-72.)

On September 2, 2021, Daniel Walter, Psy.D., a state agency psychologist, completed a PRTF, finding Wallace's speech and language impairment and borderline intellectual functioning were severe. (R. at 68-69.) Walter opined Wallace had mild limitations on his ability to interact with others and to adapt or manage himself and moderate limitations on his ability to understand, remember or apply information and to concentrate, persist or maintain pace. (R. at 68.) He noted that, despite functioning at the lower level of intelligence, Wallace was able to work in a semi-skilled job for the past 14 years. (R. at 69.) He also noted that Wallace was able to drive, to handle finances, to perform personal care, to prepare simple meals, to do household chores and to live alone. (R. at 69.)  Thus, he opined Wallace could perform simple, routine tasks.  (R. at 69.)

That same day, Walter completed a mental assessment, finding Wallace was markedly[7] limited in his ability to understand, remember and carry out detailed instructions and moderately limited in his ability to sustain an ordinary routine without special supervision. (R. at 72-73.) Walter stated Wallace's work-related mental abilities were, otherwise, not significantly limited. (R. at 72-73.) Walter noted that Wallace functioned at the borderline to severe level of intellect and would have difficulty completing complex and detailed tasks, but would be able to perform simple, routine tasks. (R. at 72.)

---

[7] The regulations define "marked limitations" as an individual's ability to function independently, appropriately, effectively and on a sustained basis as seriously limited. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(F)(2)(d) (2022).

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2022). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2022).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider

-11-

whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Wallace filed his application in September 2020; thus, 20 C.F.R. § 404.1520c governs how the ALJ considered the medical opinions here.[8] When making a residual functional capacity assessment, the ALJ must assess every medical opinion received in evidence. The regulations provide that the ALJ "will not defer or give any specific evidentiary weight, including controlling weight" to any medical opinions or prior administrative medical findings, including those from the claimant's medical sources. 20 C.F.R. § 404.1520c(a) (2022). Instead, an ALJ must consider and articulate how *persuasive* he finds all the medical opinions and all prior administrative medical findings in a claimant's case. *See* 20 C.F.R. § 404.1520c(b), (c)(1)-(5) (2022) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. § 404.1520c(b)(1) (2022).

The most important factors in evaluating the persuasiveness of these medical opinions and prior administrative medical findings are supportability and consistency, and the ALJ will explain how he considered these two factors in his decision. *See* 20 C.F.R. § 404.1520c(b)(2). "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical

---

[8] 20 C.F.R. § 404.1520c applies to claims filed on or after March 27, 2017. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)).

evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(2). The ALJ is not required to explain the consideration of the other three factors, including relationship with the claimant, specialization and other factors such as an understanding of the disability program's policies and evidentiary requirements.[9] *See* 20 C.F.R. § 404.1520c(b)(2).

Wallace argues the ALJ erred by improperly determining his residual functional capacity by rejecting the opinions of Dr. Nysather and Kinder. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 6-11). Wallace further argues that the ALJ erred by failing to give appropriate credence to his allegations and properly assess the effect of pain on his ability to perform substantial gainful activity. (Plaintiff's Brief at 11-14.)

A claimant's residual functional capacity refers to the most the claimant can still do despite his limitations. *See* 20 C.F.R. § 404.1545(a) (2022). The ALJ found that Wallace had the residual functional capacity to perform medium work, except he could perform work involving instructions and tasks limited to those that can be learned in 30 days or less; that required no more than occasional decision making and changes in the work setting; and no more than occasional interaction with the public. (R. at 20.)

---

[9] An exception to this is that when the ALJ finds that two or more "medical opinions or prior administrative medical findings about the same issue are both equally well-supported [] and consistent with the record [] but are not exactly the same," the ALJ will explain how he considered the other most persuasive factors including: the medical source's relationship with the claimant, specialization and other factors that tend to support or contradict a medical opinion. 20 C.F.R. § 404.1520c(b)(3) (2022).

Wallace argues that the ALJ did not properly consider his allegations of pain. Contrary to Wallace's argument, the Commissioner contends that substantial evidence supports the ALJ's finding that Wallace's statements about the intensity, persistence and limiting effects of his symptoms were inconsistent with the record. It is noted that Wallace did not cite to record evidence that would support further limitations or otherwise undermine the ALJ's decision.

The Fourth Circuit recently reiterated the two-step framework, set forth in 20 C.F.R. § 404.1529 and Social Security Ruling, ("S.S.R."), 16-3p, 2017 WL 5180304 (Oct. 25, 2017), for evaluating a claimant's symptoms, such as pain.[10] *See Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83 (4th Cir. 2020). First, the ALJ must determine whether objective medical evidence[11] presents a "medically determinable impairment" that could reasonably be expected to produce the claimant's alleged symptoms. *Arakas*, 983 F.3d at 95 (citations omitted); *see also Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). Second, after finding a medically determinable impairment, the ALJ must assess the intensity and persistence of the alleged symptoms to determine how they affect the claimant's ability to work and whether he is disabled. *See Arakas*, 983 F.3d at 95 (citations omitted); *see also Craig*, 76 F.3d at 595. Because "[s]ymptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques," ALJs must consider the entire case record and may "not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate" them. S.S.R. 16-3p, 2017 WL 5180304, at *5; *see*

---

[10] "Symptoms" are defined in the regulations as a claimant's own description of his medical impairment. *See* 20 C.F.R. § 404.1502(i) (2022).

[11] The regulations define "objective medical evidence" as "evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption." 20 C.F.R. § 404.1529(c)(2) (2022).

*also* 20 C.F.R. § 404.1529(c)(2); *Craig*, 76 F.3d at 595. In other words, "while there must be objective medical evidence of some condition that could reasonably produce the pain, there need not be objective evidence of the pain itself or its intensity." *Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir. 1989); *see also Craig*, 76 F.3d at 593.

However, the Fourth Circuit has held that objective medical evidence and other objective evidence are "crucial" in evaluating the second prong of the symptom analysis test. *Craig*, 76 F.3d at 595. In *Craig*, the Fourth Circuit stated, "[a]lthough a claimant's allegations about [his] pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges [he] suffers." 76 F.3d at 595. Specifically, the ALJ must consider "any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence, including [his medical] history, the signs and laboratory findings, and statements by [his] medical sources or other persons about how [his] symptoms affect [him]." 20 C.F.R. § 404.1529(c)(4) (2022). The regulations direct that a claimant's "symptoms, including pain, will be determined to diminish [his] capacity for basic work activities to the extent that [his] alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(c)(4).

Here, the ALJ stated as follows in his decision:

… [T]he undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSR 16-3p.

… In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable … impairment[s … that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying … impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities.

(R. at 20.) In his decision, the ALJ found that the medical evidence was not supportive of disability based upon the clinical findings and the totality of the evidence. (R. at 23.) The ALJ found that Wallace's statements were unsupported because the record indicated he lost his job when his company closed at the alleged onset date and that he, thereafter, received unemployment benefits through the third quarter of 2021. (R. at 20, 23.) The ALJ noted that Wallace testified that he continued to look for work throughout that period. (R. at 20, 23.) As further support for finding Wallace's statements lacked persuasiveness, the ALJ noted that medical records did not support the extent of limitations alleged by Wallace, highlighting that no provider noted any significant changes in Wallace's condition since he stopped working, and no one prescribed pain medication. (R. at 23.) The ALJ concluded that the record as a whole did not reveal "historical medical treatment one would expect for a totally disabled individual," and "the medical evidence was not supportive of disability based upon the clinical findings and the totality of the evidence." (R. at 23.) Thus, the ALJ explicitly set out the appropriate, two-step legal framework for considering Wallace's allegations of pain in his decision.

The ALJ next turned to an analysis of Wallace's symptoms, stating, in part, "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms. …" (R. at 21.) Thus, the ALJ satisfied the first part of the two-part test for analyzing Wallace's allegations about his symptoms. *See Arakas*, 983 F.3d at 95; *Craig*, 76 F.3d at 594. The real issue, therefore, is whether he correctly analyzed Wallace's pain under the second part of this test. For the reasons that follow, I find that he did.

In his decision, the ALJ stated, "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record. …"  (R. at 21.)  The ALJ noted that treatment record indicated conservative treatment due to muscle spasms and lumbago, osteoarthritis, acid reflux and cardiac murmur with prescribed medications. (R. at 23.) He noted that radiology reports were largely negative, and findings of consultative examinations showed no acute pathology or disease process. (R. at 23.) The ALJ noted that Wallace's medical care providers advised continued conservative treatment with use of topical musculoskeletal pain relief creams and over-the-counter medication management of GERD and vitamin D deficiency. (R. at 21.) In addition, the ALJ noted that Wallace could manage his own personal care, perform activities around the house, drive and prepare meals without significant limitations. (R. at 23.)

In making his residual functional capacity finding, the ALJ found Dr. Nysather's April 2021 evaluation unpersuasive, as Wallace's initial allegations did not identify back pain,[12] and other supporting medical evidence shows no significant

---

[12] It is noted that, during his visit with Dr. Nysather, Wallace alleged disability due to back pain.

findings or abnormalities. (R. at 22.) Dr. Nysather opined Wallace could sit, walk and/or stand for four to six hours in an eight-hour workday with breaks; he could lift and carry items weighing up to 20 pounds; and he should limit activities involving squatting, crawling and stooping. In April 2021, x-rays of Wallace's lumbar spine showed mild anterior wedging of the T12; mild L4-L5 disc space narrowing; and his SI joints and sacral foramen were unremarkable, and x-rays of his left knee were normal. In addition, Wallace stated that he used over-the-counter cream and Tylenol for arthritis, back pain and bilateral knee and shoulder pain. In addition, the ALJ noted that Wallace's medical records from just prior to the alleged onset date of disability showed normal ambulation, appearance, strength, musculoskeletal range of motion, sensation, reflexes and coordination. (R. at 21.) In fact, in January and September 2020, Wallace reported no back pain; no muscle aches or weakness; no joint pain; no swelling in his extremities; no neck pain; and no difficulty walking. (R. at 318, 320.)

The ALJ stated he found the opinions of the state agency consultants persuasive. (R. at 22.) Both state agency physicians found Dr. Nysather's opinion to be inconsistent with Wallace's abilities to perform his daily activities and was not an accurate longitudinal representation of his medical history, noting that it was an "overestimate of the severity of [Wallace's] restrictions/limitations." (R. at 59, 70.) The state agency physicians noted that Wallace's examinations prior to Dr. Nysather's consultative examination were normal, and imaging of the lumbar spine and left knee were normal. (R. at 60, 70-72.) Dr. Nysather's examination findings showed Wallace had a normal gait; he had decreased range of motion of the lumbar spine with muscle spasm, but no tenderness; he was able to rise from a sitting position without assistance, stand on tiptoes, heels and tandem walk without problems; he was able to bend and squat with mild difficulty; his grip strength was 5/5 with adequate fine motor movements, dexterity and ability to grasp objects,

bilaterally; he had crepitus of both knees and shoulders upon range of motion; he had good tone and full strength, bilaterally, in all muscle groups; his reflexes were normal; and he had intact sensation. The state agency physicians noted that they incorporated observations from Dr. Nysather's consultative examination into their residual functional capacity findings. (R. at 60, 71-72.)

The ALJ stated he found Kinder's psychological consultative evaluation persuasive, as findings of the examination were consistent with and supported by his findings. (R. at 23.) Kinder found that Wallace's hygiene and grooming were normal; his speech was delayed; his mood was normal; he was cooperative; he made good eye contact; his sensorium was intact; he functioned in the borderline range of intelligence; he was fully oriented; his thought processes were goal-directed and unimpaired; he exhibited no perceptual disturbances; his judgment and insight were fair; he had no difficulty with remote recall, as he was able to remember three of three named objects after a five-minute delay; and he had no problems with immediate recall, as he was able to recall five numbers in sequence. Kinder opined that Wallace should be able to "perform sustained simple tasks well" and "maintain regular attendance in the workplace." Kinder also opined that routine stressors encountered in the workplace should not overwhelm Wallace if he had frequent breaks.[13] Thus, Wallace argues that the ALJ should have incorporated "frequent breaks" into his residual functional capacity assessment. It is well-settled that it is the ALJ's duty to determine a claimant's residual functional capacity. *See* 20 C.F.R. § 404.1546(c) (2022).  The ALJ limited Wallace to only occasional decision making, occasional changes in the work setting and occasional interaction with the public. (R. at 20.) With respect to Wallace's mental health, there are minimal treatment records and no evidence of any limitations related to handling routine stressors. In

---

[13] Wallace fails to acknowledge that Kinder did not define "frequent breaks."

April 2021, Dr. Nysather found that Wallace was fully oriented and cooperative; he did not appear depressed or anxious; he was able to communicate with no deficits; his recent and remote memory were intact; and he had fair to good insight and judgment. Dr. Nysather opined that Wallace could respond appropriately to questions; he could carry out and remember instructions; and he had a preserved mental status with appropriate orientation, affect, thought content, memory and fund of information. Although Wallace listed his expressive language disorder and intellectual disability as disabling impairments, upon questioning by Dr. Nysather, Wallace denied any special needs concerning these impairments at the time of his examination or previously.

The ALJ found the opinions of the state agency psychologists persuasive, as their opinions were supported by the record. (R. at 22.) The ALJ noted that mental health records show Wallace functioned at the lower end of intellect with a history of sustained skilled work over the relevant period. (R. at 22.) As discussed by the ALJ, the evidence shows that Wallace was able to manage his own personal care, perform activities around he home, drive and prepare meals without significant limitations. (R. at 23.) Both state agency psychologists found that Kinder's opinion was inconsistent with Wallace's actual mental abilities, noting that Wallace had been working for a prolonged period of time in skilled/semi-skilled work and that no other medical records substantiated Kinder's findings.

For all the above-stated reasons, I find that the ALJ did not improperly disregard Wallace's statements about his pain. To the contrary, the ALJ thoroughly considered such statements and credited them to the extent they were consistent with the record as a whole. As stated herein, in making the determination at the second prong of the symptom evaluation framework, the ALJ must examine the entire case record, including the objective medical evidence, the claimant's statements about

the intensity, persistence and limiting effects of his symptoms, statements and other information provided by medical sources and other persons and any other relevant evidence in the claimant's record. *See* S.S.R. 16-3p, 2017 WL 5180304, at *4. Here, the ALJ reviewed Wallace's relevant medical history and his subjective allegations before finding his statements regarding the severity of his limitations were not entirely credible because they were not fully supported by the objective medical evidence and his treatment history. The ALJ was entitled to find that the objective medical evidence outweighed Wallace's subjective statements, and he provided a sufficient rationale for doing so. It is well-supported that a reviewing court gives great weight to an ALJ's assessment of a claimant's credibility and should not interfere with that assessment where the evidence of record supports the ALJ's conclusions. *See Shively v. Heckler*, 739 F.2d 987, 989-90 (4th Cir. 1984). Here, the ALJ's decision was thorough and applied the proper legal standard, and this court will not reweigh the evidence.

For all the foregoing reasons, I find that the ALJ's evaluation of Wallace's pain was based on a correct legal standard and is supported by substantial evidence. Based on the same evidence stated above, I further find that substantial evidence supports the ALJ's consideration of the opinion evidence, his residual functional capacity finding and ultimate finding that Wallace was not disabled under the Act and not entitled to benefits.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's analysis of Wallace's subjective complaints of pain;

2. Substantial evidence exists in the record to support the ALJ's consideration of the opinion evidence;

3. Substantial evidence exists in the record to support the ALJ's residual functional capacity finding; and

4. Substantial evidence exists in the record to support the Commissioner's finding that Wallace was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Wallace's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:       January 16, 2024.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE